STEPHEN D. SMITH, JR. *vs.* DANIELLE MCDONALD.

Worcester. October 7, 2010. - December 14, 2010.

Present: MARSHALL, C.J., SPINA, COWIN, CORDY, BOTSFORD, & GANTS, JJ.[1]

*Minor,* Custody. *Parent and Child,* Custody, Child support, Right to visit non-
marital child. *Probate Court,* Findings by judge, Custody of child.

Discussion of the general legal framework in child custody, visitation, and
relocation cases, and discussion of G. L. c. 209C, which establishes a
comprehensive scheme for determining paternity and for establishing child
support, visitation, and custody rights for children born outside a marriage.
[544-547]
In proceedings arising from a complaint to establish paternity, during which
the mother moved with the child from Massachusetts to New York, the
probate judge exceeded her statutory authority by ordering the child returned
to Massachusetts while retaining sole physical custody in the mother,
where, given that the paternity of the child had not yet been established,
the mother was not required to seek consent of the father or the court to
relocate to New York, had relocated lawfully with the child, and could not
be ordered subsequently to return to Massachusetts [547-550]; therefore,
this court vacated the order and remanded the matter for reconsideration of
the other orders regarding visitation [550-552] and custody [553-556],
which were entwined with the erroneous order to return to Massachusetts.
MARSHALL, C.J., concurring, with whom SPINA, J., joined.
No reason appeared on the record of paternity proceedings to vacate the judg-
ment awarding the mother prospective child support but making no award
of past child support. [552-553]

COMPLAINT to establish paternity filed in the Worcester Divi-
sion of the Probate and Family Court Department on February
21, 2008.

The case was heard by *Lucille A. DiLeo,* J.

The Supreme Judicial Court on its own initiative transferred
the case from the Appeals Court.

*Barbara J. Katzenberg* for the mother.

*Julie A. Rougeau (Leila Wons & William Hickey* with her) for
the father.

---

[1]Chief Justice Marshall participated in the deliberation on this case and
authored the concurring opinion prior to her retirement.

*Christina L. Paradiso & Edward M. Ginsburg*, for Legal Assistance Corporation of Central Massachusetts, amicus curiae, submitted a brief.

COWIN, J. A child was born to the defendant, Danielle McDonald (mother), and the plaintiff, Steven D. Smith, Jr. (father), who were not married. When the child was six months old, the mother moved with the child from Massachusetts to New York. Subsequently, as part of the proceedings at issue in this case, the plaintiff was determined to be the legal father of the child. A judge of the Probate and Family Court ordered the child returned to Massachusetts, gave sole physical custody to the mother, and awarded visitation rights and joint legal custody to the father. The mother challenges various provisions of the judgment. The evidence supports the judge's determination that the best interests of the child require a meaningful opportunity for a father-child relationship, and the judge acted within her discretion in developing a plan to increase contact between the father and the child. However, the judge's order to return the child to Massachusetts exceeded her statutory authority, and the judge's decision to award joint legal custody was not supported on this record. Given the current circumstances of the parties, the case requires further action by the judge in the Probate and Family Court, and we remand for that purpose.[2]

1. *Background and prior proceedings.* We set forth the following facts drawn from the findings of the Probate and Family Court judge, reserving some facts for later discussion. The mother and father met and conceived the child in late 2006. The parties never married. Their relationship ended within a few months, but they remained in contact during the pregnancy and discussed visitation and child support. The mother did not want the father present at the birth but told him that he would be listed on the birth certificate. The child was born on August 29, 2007. The father began paying voluntary child support of $400 every two weeks and visited the child for a few hours each week, in sessions supervised by the mother. At the time, the mother lived in Milford and the father lived in Bellingham, approximately fifteen to twenty minutes away.

---

[2]We acknowledge the amicus brief of the Legal Assistance Corporation of Central Massachusetts.

Early in 2008, the visitation arrangement deteriorated. The father discovered that he was not on the child's birth certificate, and on February 21, 2008, he filed a complaint and motion for temporary orders in the Probate and Family Court. He sought to establish paternity, formalize child support, and obtain both unsupervised visitation rights and a requirement that the parents notify each other before taking the child to another State.[3] He visited the child at the mother's home in Milford on February 27, 2008, but did not inform the mother of the court action until March 1, 2008, when they spoke by telephone. During his last visit, the father did not observe any signs that the mother was about to move.

On February 28, 2008, the mother vacated her apartment in Milford. On March 1, 2008, she moved to Batavia, New York, approximately 400 miles from the father's home in Bellingham. The mother did not tell the father of the move when they spoke on the telephone that day. He learned that the mother and child had moved when, several days later, service of the complaint on the mother was attempted at her Milford apartment.

After receiving this information, the father sought and obtained an ex parte temporary order that the mother and child return to Massachusetts immediately. The order was stayed pending trial. Prior to trial, the parties filed a stipulation for voluntary acknowledgment of parentage affirming the father's paternity. The parties do not dispute that the father paid voluntary child support until trial began in July, 2008. During trial, the father added a request for joint legal and physical custody.

The trial judge entered a judgment in December, 2008, and findings of fact and conclusions of law followed. The judge found that, while the father was dedicated to developing a relationship with his offspring, the mother believed the father did not deserve time with the child. The mother refused to give the father unsupervised time with the child, was "hostil[e]" in her communications, hindered the father's efforts to obtain more visitation, and intentionally concealed her plan to relocate.

With respect to the relocation, the judge determined that the mother had moved without permission of the father or the court.

---

[3]The temporary orders were eventually allowed, but not until July, 2008.

Applying the test set forth in *Yannas* v. *Frondistou-Yannas*, 395 Mass. 704, 711-712 (1985) (*Yannas*), the judge found that the mother had not shown that moving to New York offered a "real advantage" to the mother or the child. The mother claimed she had relocated because her own mother lived in Batavia and because the costs of living were lower there. The judge found, however, that her real purpose was to deprive the father of a relationship with the child. Furthermore, the mother had not demonstrated that she had gained any economic, social, or emotional advantage from the move. The judge concluded that the relocation to New York was not in the best interests of the child, the mother, or the father. The move "significantly impacted bonding" between the father and child at a "critical age" when the child needed consistent contact with both parents; deprived the mother and child of support systems in Massachusetts; and reduced substantially the father's visitation with the child.

The judge ordered the child returned to Massachusetts within sixty days, and prohibited future removal absent permission of the other parent or the court. The judge awarded the mother sole physical custody and gave the parties joint legal custody. The father was ordered to pay child support in the amount of $260 per week and provide health insurance for the child. The judge ordered that the father have a schedule of "parenting time" with the child that gradually increased over several months, progressing to overnights after two months and weekends after four months, as well as holidays and increasingly long summer vacations.

After the judgment entered, the mother sought and obtained a stay of the order to return to Massachusetts from a single justice of the Appeals Court. The same single justice later vacated the stay effective May 11, 2009, and the mother and child moved back to Massachusetts.[4] The mother appealed from the judg-

---

[4]The record does not indicate when the mother and child returned to the Commonwealth. Because the mother and child now reside in Massachusetts only as a result of a court order, their residence within the Commonwealth does not render moot the mother's objections to the order requiring the child (and the mother, in order to retain custody) to return to Massachusetts. Even were the issue moot, the matter is one of public importance, has been fully briefed and argued by the parties, and is likely to recur. See *Commonwealth* v. *Washington W.*, 457 Mass. 140, 142 n.3 (2010); *Lockhart* v. *Attorney Gen.*, 390 Mass. 780, 782-783 (1984).

ment of the Probate and Family Court, and we transferred the case sua sponte.[5]

2. *Legal framework.* The best interests of the child is the "touchstone inquiry" in child custody, visitation, and relocation cases. *Custody of Kali,* 439 Mass. 834, 840 (2003); *Yannas, supra* at 710-711. On the basis of the evidence presented, the judge must identify the parenting and living arrangement that "can best satisfy the child's welfare and happiness." *Opinion of the Justices to the Senate,* 427 Mass. 1201, 1204 (1998). While "the feelings and the wishes of the parents should not be disregarded, the happiness and the welfare of the child should be the controlling consideration." *Vilakazi* v. *Maxie,* 371 Mass. 406, 409 (1976), quoting *Jenkins* v. *Jenkins,* 304 Mass. 248, 250 (1939). At the same time, the court must not pursue blindly some "optimum" arrangement for the child and must give due regard to the adequacy of the status quo. *Custody of Kali, supra* at 843.

The statute governing nonmarital children,[6] G. L. c. 209C, establishes a comprehensive scheme for determining paternity and for establishing child support, visitation, and custody rights for children born outside of a marriage. The statute declares that nonmarital children "shall be entitled to the same rights and protections of the law as all other children." G. L. c. 209C, § 1. A putative father of a nonmarital child may become a legal parent in one of two ways only: through an adjudication, or by filing a voluntary acknowledgment of paternity executed by both parents. G. L. c. 209C, § 2.[7] Once paternity is established, however, the father, if not unfit, has a constitutionally protected right to parent and maintain a relationship with his child. See *C.C.* v.

---

[5]Although the mother and child were living in another State at the time of trial, neither party challenged the jurisdiction of the Massachusetts court to adjudicate the situation.

[6]Although the statute refers to these children as "children born out of wedlock," the term "nonmarital child" is preferred. See *Woodward* v. *Commissioner of Social Sec.,* 435 Mass. 536, 543 n.12 (2002).

[7]General Laws c. 209C, § 2, states in relevant part:

"Paternity may be established by filing with the court, the clerk of the city or town where the child was born or the registrar of vital records and statistics an acknowledgment of parentage executed by both parents pursuant to [G. L. c. 209C, § 11,] or pursuant to an action to establish paternity filed pursuant to this chapter . . . ."

*A.B.*, 406 Mass. 679, 685-686 (1990), citing *Stanley* v. *Illinois*, 405 U.S. 645, 651-652 (1972). The court may award custody and visitation rights to an adjudicated father, G. L. c. 209C, §§ 1, 10, and may order an adjudicated father to provide financial support and health insurance for a child, G. L. c. 209C, § 9.

Prior to a legal determination of paternity, the child's mother is vested with sole physical and legal custody, and that custody arrangement continues even after paternity is established until modified by a court. See G. L. c. 209C, § 10 (*b*).[8] In modifying custody, the court may award sole custody to either parent or joint custody to both parents "as may be appropriate in the best interests of the child." See G. L. c. 209C, § 10 (*a*). Joint custody may be awarded, however, only if the parents previously have made a formal custody arrangement approved by the court, or if the court finds the parents have demonstrated an ability to cooperate in raising the child.[9] Moreover, the statute provides a framework for the court's "best interests" analysis by requiring the court to preserve the child's relationship with the "primary caretaker parent" when possible, and by mandating consideration of preexisting parental and living arrangements.[10] These statutory

---

[8]General Laws c. 209C, § 10 (*b*), states:

> "Prior to or in the absence of an adjudication or voluntary acknowledgment of paternity, the mother shall have custody of a child born out of wedlock. In the absence of an order or judgment of a probate and family court relative to custody, the mother shall continue to have custody of a child after an adjudication of paternity or voluntary acknowledgment of parentage."

[9]General Laws c. 209C, § 10 (*a*), states in relevant part:

> "In awarding the parents joint custody, the court shall do so only if the parents have entered into an agreement pursuant to [G. L. c. 209C, § 11,] or the court finds that the parents have successfully exercised joint responsibility for the child prior to the commencement of proceedings pursuant to this chapter and have the ability to communicate and plan with each other concerning the child's best interests."

A formal custody agreement between the parents "shall be approved only if the court finds it to be in the best interests of the child." G. L. c. 209C, § 11 (*b*). The requirement of court approval ensures that the parents' wishes cannot prevail over the best interests of the child.

[10]General Laws c. 209C, § 10 (*a*), states in relevant part:

> "In awarding custody to one of the parents, the court shall, to the

requirements "neither replace the 'best interests of the child' standard nor limit the factors that a judge may consider in determining what custodial arrangements are in the best interests of the child." *Custody of Kali, supra* at 843-844.

General Laws c. 209C does not address the relocation of non-marital children outside the Commonwealth. Relocation of children of divorced parents is governed by G. L. c. 208, § 30, which requires a parent with physical custody to obtain either the consent of the child's other parent or a court order before moving the child outside the Commonwealth.[11] The court may authorize relocation of the child "upon cause shown," meaning that the removal must be in the child's best interests. *Yannas, supra* at 711. While a statute governing divorced children is not applicable directly to nonmarital children, the legal equality of nonmarital children pursuant to G. L. c. 209C, § 1, dictates the same rule apply for children in comparable circumstances. Accordingly, when a nonmarital child has two legal parents, the parent[12] with custody may not move the child outside the Commonwealth without the permission of the other parent or of a court. See *Wakefield* v. *Hegarty,* 67 Mass. App. Ct. 772, 775 (2006).[13]

---

extent possible, preserve the relationship between the child and the primary caretaker parent. The court shall also consider where and with whom the child has resided within the six months immediately preceding proceedings pursuant to this chapter and whether one or both of the parents has established a personal and parental relationship with the child or has exercised parental responsibility in the best interests of the child."

[11]General Laws c. 208, § 30, states:

"A minor child of divorced parents who is a native of or has resided five years within this [C]ommonwealth and over whose custody and maintenance a probate court has jurisdiction shall not, if of suitable age to signify his consent, be removed out of this [C]ommonwealth without such consent, or, if under that age, without the consent of both parents, unless the court upon cause shown otherwise orders. The court, upon application of any person in behalf of such child, may require security and issue writs and processes to effect the purposes of this . . . section[]."

[12]We use the term "parent" here and in the following paragraph to mean a legal parent, that is, a parent of a marital child, and, with respect to a non-marital child, a mother and a father whose paternity has been established pursuant to G. L. c. 209C.

[13]Similarly, while G. L. c. 208, § 30, applies only to relocation outside the

When a parent has sole custody of a child and seeks to relocate with the child outside the Commonwealth over the other, noncustodial parent's objection, the analysis articulated in *Yannas, supra* at 710-712, applies whether the parents are separated, divorced or were never married.[14] The *Yannas* analysis recognizes that "the best interests of a child are . . . interwoven with the well-being of the custodial parent," and that moving may afford benefits to the custodial parent that, in turn, benefit the child. *Id.* at 710, quoting *Cooper* v. *Cooper*, 99 N.J. 42, 54 (1984). Accordingly, the court should first consider whether the custodial parent can "establish[] a good, sincere reason" for the move, demonstrating that the move offers a "real advantage." *Yannas, supra* at 711-712. If so, the judge must balance the relative advantages to the custodial parent from the move, the potential impacts on the child's development and quality of life, and any effects on the relationship between the noncustodial parent and the child. No single factor is determinative, *id.*, and "the best interests of the child[] always remain the paramount concern." *Id.* at 710. See *Williams* v. *Pitney*, 409 Mass. 449, 455-456 (1991) (describing proper application of *Yannas* test).

3. *Discussion.* Determining what parenting and living arrangements will be in a child's best interests "presents the trial judge 'with a classic example of a discretionary decision.' " *Youmans* v. *Ramos*, 429 Mass. 774, 787 (1999), quoting *Adoption of a Minor (No. 2)*, 367 Mass. 684, 688 (1975). The judge is afforded considerable freedom to identify pertinent factors in assessing the welfare of the child and weigh them as she sees fit. See *Custody of Zia*, 50 Mass. App. Ct. 237, 243-244 (2000). The judge's findings of fact will be left undisturbed unless clearly erroneous. *Custody of Eleanor*, 414 Mass. 795, 799 (1993). Absent clear error, we review the judge's determination of the child's best interests only for abuse of discretion. *Mason* v. *Coleman*, 447 Mass. 177, 184 (2006).

Commonwealth, "[w]e apply out-of-State removal principles to in-State moves," pursuant to common law, in cases where the move would disrupt significantly existing parenting arrangements, such as when the move is long-distance. *Altomare* v. *Altomare*, 77 Mass. App. Ct. 601, 602-603 (2010), citing *D.C.* v. *J.S.*, 58 Mass. App. Ct. 351, 355-356 (2003).

[14]A different analysis, more protective of the interests of the parent who is not relocating, is appropriate when the parents share joint physical custody. See *Mason* v. *Coleman*, 447 Mass. 177, 184-185 (2006).

The judge's duty in parenting disputes is to craft a system of parenting that, taken as a whole, furthers the welfare of the child. Here, the judge concluded essentially that the child's best interests were promoted by contact with his father. That conclusion was supported by the judge's findings. The judge found that the child was deprived of adequate opportunities to bond with the father and that this deprivation was aggravated both by the child's relocation to New York and by the mother's refusal to permit unsupervised visitation. The judge found also that the father sought actively to have a significant role in his child's life, and that such a relationship would be beneficial to the child. Those findings were plainly permissible on this record.

Having concluded that the father and child needed "adequate alone time," the judge was faced with the question how to achieve that goal where the parties lived over 400 miles apart. The judge's solution was to order the child returned to Massachusetts while retaining sole physical custody in the mother, and to award the father joint legal custody and frequent visitation. However sensible that parenting arrangement might be in the abstract, it exceeded the judge's statutory authority. Although probate judges have broad equitable powers to act in the best interests of children under their jurisdiction, *E.N.O.* v. *L.M.M.*, 429 Mass. 824, 827-828 (1999), those powers are not unlimited. In the circumstances of this case, the judge lacked authority to order the child returned to Massachusetts without altering physical custody.[15] Moreover, the judge's award of joint legal custody was unsupported by her findings and thus was not permitted by the statute.

a. *Order to return to Massachusetts.* The judge, as noted, concluded that the mother was required to obtain the consent of the father or the court before relocating with the child to New York. As a result, the judge employed a *Yannas* analysis to determine whether living in New York was in the child's best interests, concluded that it was not, and ordered the child returned

---

[15]Of course, had the judge awarded sole physical custody to the father, the judge could have ordered the child returned to the Commonwealth so that the father could assume custody. See, e.g., *Prenaveau* v. *Prenaveau*, 75 Mass. App. Ct. 131, 144 (2009) (reinstating order granting sole physical custody to mother in Massachusetts, and ordering children residing with father in New Hampshire at that time to be returned to Massachusetts).

to Massachusetts. Because the judge also ordered the mother to retain sole physical custody, the mother effectively was ordered to return to Massachusetts as well. In the circumstances of this case, the mother was not required to obtain permission to relocate when she did, and consequently the judge's approach was erroneous.

In past cases evaluating a parent's relocation outside Massachusetts with a child, the child had two legal parents between whom custodial rights had been allocated at the time of relocation. See, e.g., *Mason* v. *Coleman, supra* at 183 (father with joint legal and physical custody refused to allow ex-wife to relocate with children to New Hampshire); *Wakefield* v. *Hegarty, supra* at 773, 775 (adjudicated father with joint legal custody of nonmarital child refused to allow mother to relocate with child to Virgin Islands). Because the child in question had two legal parents, permission to relocate was required in order to protect the rights of the other parent to develop a relationship with the child. See *Wakefield* v. *Hegarty, supra* at 775. When a parent violated that requirement by relocating without the necessary consent, a judge properly could order the parent to return to the Commonwealth with the child. See *Cartledge* v. *Evans,* 67 Mass. App. Ct. 577, 578 (2006) (removal request denied, and mother who relocated with child to Connecticut while removal request was pending before court was ordered to return to Massachusetts with child).

Permission to relocate, however, is not required when a child has only one legal parent. Such is the case for a nonmarital child prior to any proceedings to determine paternity or allocate custodial rights. When the paternity of a nonmarital child has not yet been established pursuant to G. L. c. 209C, § 2, the mother is the child's only parent. The putative biological father has no legal rights that need to be protected by the court, and the mother may relocate freely with the child. The court cannot reverse the parent's lawful relocation or require the legal parent to meet the standards of a *Yannas* analysis by demonstrating a "real advantage" resulting from the move.

Here, the child had only one legal parent when the mother relocated to New York on March 1, 2008. Because the father's paternity had not been adjudicated or voluntarily acknowledged,

he had no legal rights vis-à-vis the child. The mother was free to move with the child wherever she wished. She was not required to seek permission to relocate, nor was it appropriate to apply the first step of a *Yannas* analysis and require her to demonstrate that the relocation conferred a "real advantage." Because the mother had relocated lawfully with the child, the mother could not be ordered subsequently to return to Massachusetts.

The judge's analysis in this case was marred from the start by her faulty assumption that the mother was obligated to seek consent of the father or the court to relocate to New York with the child. In awarding custody, the judge had to take as a given the residences of both parents at the time she rendered her decision. The judge had only three permissible options: she could award sole custody to the mother and have the child reside in New York, award sole custody to the father and have the child reside in Massachusetts, or award joint custody and have the child reside part of the time at each of the parents' residences. Taking into account opportunities for visitation and the limitations enumerated in G. L. c. 209C, § 10 (*a*),[16] the judge had to select the one custody arrangement of those three that was in the child's best interests. Although the judge's "fourth option" might have been ideal for the child, it exceeded her authority.

The judge's erroneous analysis requires that we vacate the order to return the child to Massachusetts. The orders regarding custody and visitation were entwined inextricably with the erroneous order to return to Massachusetts and must be vacated as well. The judge's *Yannas* analysis was not the appropriate framework in which to evaluate the best interests of the child, and it is not clear that, had she not employed that approach, she would have developed the same plan regarding "parenting time" and custody. While a remand is therefore required, we briefly address the mother's other objections to the judge's orders.

b. *Visitation schedule.* As stated, the judge ordered a gradually increasing schedule of "parenting time" for the father, including holidays and, over time, overnights and weekends. When one parent has sole physical custody of a child, the other parent is ordinarily entitled to reasonable visitation. See C.P.

---

[16]See notes 9 and 10, *supra.*

Kindregan, Jr. & M.L. Inker, Family Law and Practice § 48:1, at 496-497 (3d ed. 2002). That presumption applies equally to parents of nonmarital children. See *Normand* v. *Barkei*, 385 Mass. 851, 851-852 (1982). It arises from the general principle that having contact with both parents benefits a child. See *Felton* v. *Felton*, 383 Mass. 232, 234 (1981). See also *Pizzino* v. *Miller*, 67 Mass. App. Ct. 865, 871 (2006) (noncustodial parent "has an independent interest in continued, meaningful involvement with the upbringing of his or her child").

The mother claims the judge erred in awarding the father "extensive and lengthy visitation that quickly accelerated to overnights and weekends." The mother notes that the judge did not address certain issues raised at trial, namely that the child continued to breast feed and nursed frequently, ate an exclusively vegetarian diet, wore cloth diapers, slept with the mother, and had never been away from the mother for more than three hours. She objects also that the judgment does not require that the mother supervise any of the father's "parenting time." She argues that, given the manner in which her child has been raised, the judge's visitation schedule will "destroy" the child's prior living arrangements and is contrary to the child's best interests.

There was no error in the judge's decision to award visitation to the father. Maintaining preexisting living arrangements is preferred only when that arrangement is meeting a child's needs. See *Custody of Kali*, 439 Mass. 834, 843-844 (2003). The judge was warranted in concluding that the existing arrangement, in which no substantial father-child relationship was possible, did not meet those needs. A gradually increasing schedule of visitation was a reasonable approach to ensure bonding without disrupting abruptly the child's life.

The mother's specific objections are without merit. While the judgment does not provide for the mother to be present during visitation, the judge found that the mother's past supervision had impeded father-child bonding. It was within the judge's discretion to permit the father to spend time unsupervised with his child. We discern no error in the judge's failure to discuss the mother's particular approach to child-rearing. The judge is not required to address every issue raised by the parties at trial, and a lack of explicit findings does not mean the issue was not

considered. Furthermore, the judge could conclude reasonably that any disruptions from visitation were outweighed by the benefits to the child of developing a relationship with the father.

Although we conclude that visitation was properly awarded to the father, the schedule ordered by the judge was premised on the erroneous order to return the child to Massachusetts and on the circumstances that existed between the parties at the time of the order nearly two years ago. On remand, the judge is to reconsider the question of visitation as set forth in part 4, *infra*.

c. *Failure to award back child support.* Pursuant to a voluntary agreement, the father paid child support until trial began in July, 2008, but did not pay support thereafter until the judgment in December, 2008.[17] The judgment awarded the mother prospective child support, but did not require the father to pay any past child support. According to G. L. c. 209C, § 9 (*a*), if the judge finds a parent chargeable with support, the judge, "[u]pon the petition of a party," shall also order past support, taking into account any past support provided by that parent.[18] The mother argues that the judge was obligated to award retroactive child support for the period between July, 2008, and December, 2008. That argument should have been presented to the judge. See *Bercume* v. *Bercume*, 428 Mass. 635, 642 (1999). According to the record, the mother did not request that the judge award child support and the evidence would not have alerted the judge that she was entitled to any past child support. During trial, the mother filed no petition or motion for past child support, and she did not move for reconsideration or modification of the child support order after the judgment. The judge's support

---

[17]The parties do not dispute that in July, 2008, the father paid the mother all child support owing due to their voluntary agreement, and that he continued to set aside the same amounts during trial but did not pay these latter amounts to the mother.

[18]General Laws c. 209C, § 9 (*a*), states in relevant part:

"If the court finds that a parent is chargeable with the support of a child, the court shall make an order . . . requiring a parent to pay weekly or at other fixed periods a sum for and toward the current support and maintenance of such child. . . . Upon the petition of a party, the court shall also order past support for the period from the birth of the child to the entry of the order, taking into consideration the parent's ability to pay under subsection (*c*) and any support provided by the parent during such period. . . ."

order was permissible in the circumstances. We also see no reason to vacate the support order, as it was not premised on the erroneous order to return to Massachusetts.

d. *Joint custody award.* As earlier mentioned, the judge ordered that the parties have joint legal custody. Pursuant to G. L. c. 209C, § 10 (*a*), a court may award joint custody, whether legal or physical, only if the parties have made an agreement approved by the court to share custody, or if "the court finds that the parents have successfully exercised joint responsibility for the child . . . and have the ability to communicate and plan with each other."[19] The statute recognizes that involving both parents in decision making is in the child's best interests "only if the parties demonstrate an ability and desire to cooperate amicably." *Mason* v. *Coleman,* 447 Mass. 177, 182 (2006). Joint custody is inappropriate for parents whose relationship to date has been "dysfunctional, virtually nonexistent, and one of continuous conflict." *Carr* v. *Carr,* 44 Mass. App. Ct. 924, 925 (1998). See *Custody of Kali, supra* at 837 n.5; *Custody of Zia,* 50 Mass. App. Ct. 237, 244 & n.10 (2000).

In awarding joint custody absent an approved custody agreement between the parties, to comply with G. L. c. 209C, § 10 (*a*), the judge's findings must support the conclusion that the parties can cooperate in making decisions for the child and have done so in the past. *Custody of Odette,* 61 Mass. App. Ct. 904, 905 (2004). The judge is not, of course, required to parrot the statutory language. An explicit written finding, while preferable, may be unnecessary when the record indicates an entirely amicable relationship and readily "supports an inference that the requisite findings are implicit in the judge's order." *K.J.M.* v. *M.C.,* 35 Mass. App. Ct. 456, 458 (1993). However, when the record reflects a hostile and tumultuous relationship between the parties, positive findings are required that support an inference that joint decision-making authority is appropriate for the future. *Custody of Odette, supra.*

We do not, however, construe G. L. c. 209C, § 10 (*a*), in such a way that a parent who renders cooperation impossible will be rewarded invariably with sole custody. If a judge finds

---

[19]See note 9, *supra.*

that an irresponsible, hostile parent has stymied deliberately any attempts by the other parent to participate in the child's life, such a finding may support an award of sole custody to the other parent, where that custodial arrangement will not be detrimental to the child. See *Hernandez* v. *Branciforte*, 55 Mass. App. Ct. 212, 220-221 (2002) (mother's unilateral removal of child to Italy was part of reason for giving sole custody to father, because removal reflected "abject breakdown in communication . . . ascrib[ed] to the mother's defiance" and mother's "failure to place the welfare of her son above her own"). See also *In re Paternity of C.T.E.-H.*, 323 Mont. 498, 502-505 (2004) (awarding primary residential custody to father when mother had "exclud[ed him] from the child").

The mother argues that the award of joint legal custody was improper in this case because the judge failed to make a "positive finding" that the parents can exercise joint responsibility. *Custody of Odette, supra.* We agree that the judge's order was insufficiently supported by her findings. Rather than suggesting that the parties would be able to exercise joint responsibility for the child's welfare, the findings suggest the contrary. The judge found that the mother and father have clashed over child-rearing since before the child's birth. In addition to long-standing disagreements about the father's role in the child's life, the parties have been unable to agree upon or comply with a regular visitation schedule. The judge concluded that the mother moved to New York with the purpose of separating the child from the father, and that she would "actively interfere" with any extended visitation ordered by the court. Aside from the voluntary child support arrangement that existed prior to trial, there is no evidence of cooperation between the parties. In light of the history of hostility between the parties, the judge could not award joint legal custody without an explicit, and supportable, finding that the parties had cooperated in the past and would be able to do so in the future.

4. *Proceedings on remand.* In light of the erroneous analyses and orders in this case, we must remand the entire matter to the judge for reconsideration. We recognize, of course, that the present circumstances of the parties and the child are substantially different from when the judge first made her decision.

Unfortunately, the order to return the child to the Commonwealth produced an anomalous situation: although the mother and child now reside in Massachusetts, they returned here only under the threat of contempt pursuant to an unlawful order. In further proceedings in this case, the judge must attempt to remedy, to the extent possible, the wrong done to the mother, while still maintaining the child's best interests as the paramount concern.

Presently, the child has two legal parents and all the parties reside in Massachusetts. If this were a typical case, the relocation approach detailed in part 2, *supra*, would apply: any relocation by the mother to another State would require either the father's consent or permission from a court utilizing a *Yannas* analysis. That approach creates deliberate barriers to relocation in order to protect the child's existing living arrangements. In the aberrant circumstances of this case, however, it is unfair to impose such barriers upon the mother. Had there been no improper court order, the mother and child would have been free to remain in New York. The mother's compliance with that order should not be used to her detriment should she wish to return there. Instead, she should be afforded the freedom to choose where she will live that was denied to her previously.

Accordingly, a special exception to the usual procedure is warranted in this case. At the outset of proceedings on remand, the mother must inform the judge whether she wishes to live in Massachusetts or New York or elsewhere, and the judge must accept that choice. The judge must treat the mother's chosen residence as a given, and fashion a new plan for custody and visitation accordingly. We reiterate that this exception to what would ordinarily be an analysis directed to the best interests of the child obviously comes about by virtue of the unusual circumstances of this case.

In all other respects, the judge's analysis on remand should be a typical one and must give due regard to the interests of both parents, no matter where, or with whom, the child lives. If the parties have complied with the judge's visitation requirements, and if the father has in fact interacted positively with the child, the best interests of the child may now favor an entirely different custody and visitation arrangement. We leave those considerations to the judge's discretion in light of the proper legal standards.

5. *Conclusion.* The order to return the child to Massachusetts, the award of parenting time, and the award of joint legal custody are vacated, and the case is remanded to the Probate and Family Court for further proceedings consistent with this opinion. The remainder of the judgment is affirmed.

*So ordered.*

MARSHALL, C.J. (concurring, with whom Spina, J., joins). On or about March 1, 2008, Danielle McDonald, the sole legal parent of her five month old son, moved from Massachusetts to upstate New York, to be closer to her mother and stepfather in a community she felt would be more affordable. Approximately nine months later, after the mother had found housing and part-time employment in her new domicil, a judge in the Probate and Family Court ordered the child returned to Massachusetts on a judgment establishing Stephen Smith's paternity. There was no question that the mother, who retained sole physical custody of the child, was a fit, indeed a good, parent. There was no question that the father had had minimal contact with the child since February, 2008.

This appeal arises, as the court rightly concludes, because the judge impermissibly ruled, for reasons that were irrelevant under the paternity statute, G. L. c. 209C, that the mother needed the court's or the putative father's permission before she could relocate with the child to New York. See *ante* at 550. As a result of the judge's disregard of the paternity statute, what should have been a routine custody and visitation matter under G. L. c. 209C, § 10, became a prolonged, expensive, and stressful legal ordeal for the parties and significantly disrupted the child's stability. I concur in today's decision vacating the judgment, but write separately to clarify the analytical underpinnings of the court's holding.

This matter begins and ends with statutory interpretation. The paternity statute, which governs here, furthers the Legislature's expressed intent that nonmarital children be "entitled to the same rights and protections of the law as all other children," G. L. c. 209C, § 1, while simultaneously recognizing that, as a

matter of law, married and unmarried parents are not similarly situated. Among other things, the statute makes unmistakably clear that the mother is the *sole* legal parent of a nonmarital child from the moment of the child's birth until the establishment of the putative father as a legal parent, which in this case did not occur until the child was ten months old. See G. L. c. 209C, § 10 (*b*) ("Prior to or in the absence of an adjudication or voluntary acknowledgment of paternity, the mother *shall* have custody of a child born out of wedlock" [emphasis added]).[1] The statute places on a putative father who wishes to exercise parental rights the obligation to take affirmative steps to establish paternity. G. L. c. 209C, § 2. This obligation pertains regardless of whether the mother has told a man that he "is" the father of the child, has accepted money from him as "child support," or has in any other manner represented to the man that he is the father.

Here, the critical and determining fact before the judge, and before us, in applying the provisions of the paternity statute is that the mother, an unquestionably fit parent, moved to New York with the child at a time when, as the child's only legal parent, she was free to do so without the court's or the putative father's permission, even if the move disrupted arrangements she had previously made for visitation between the child and the putative father. At the time she relocated with the child, neither the putative father nor the Commonwealth had any legal authority to interfere with or review the mother's decision. These facts should have been enough to put an end to the father's legal quest to force the mother to return with the child to Massachusetts. Once it was established that the mother had relocated prior to an adjudication of paternity, the judge had no grounds to examine the reasons for or sincerity of the mother's move. After paternity was established, the judge was obligated to take as a given that the mother and the child resided 400 miles apart from, and in another State than, the father, and to fashion custody and visitation orders pursuant to the three factors set out in G. L. c. 209C, § 10 (*a*), again respecting and not

---

[1] The paternity statute further provides that "the mother shall *continue* to have custody *after* an adjudication of paternity or voluntary acknowledgment of parentage" (emphasis added) unless and until a court orders otherwise. G. L. c. 209C, § 10 (*b*).

disturbing the mother's decision to relocate. See *Custody of Kali*, 439 Mass. 834, 843 (2003) ("If the parenting arrangement in which a child has lived is satisfactory and is reasonably capable of preservation, it is ordinarily in the child's best interests to maintain that arrangement, and contrary to the child's best interest to disrupt it. Stability is itself of enormous benefit to a child, and any unnecessary tampering with the status quo simply increases the risk of harm to the child"). Seen in light of the mother's legitimate New York residence and the provisions of G. L. c. 209C, § 10 (*a*), the distance separating the parties had relevance only as a factor in devising a reasonable long-distance visitation order, a type of order with which our Probate and Family Court judges are familiar and competent to fashion.

The judge, however, as the court details, failed to follow the statutory scheme. See *ante* at 550. She made impermissible findings concerning the mother's reasons for moving to another State with the child[2]; she made irrelevant findings about the mother's choices in caring for the child[3]; and she made findings about the importance of the child bonding with the father that privileged a need to bond over the child's need for stability.[4] See *id.* at 542-543. The judge then analyzed these impermissible and irrelevant findings under the "real advantage" test set

[2]Among other things, the judge concluded that the mother "has failed to demonstrate why permitting her leave to remain in New York would be in her best interest. . . . Defendant testified that ordering her to move back to Massachusetts would inflict a significant financial burden on her. While the Court recognizes Defendant may be affected by being ordered to move back to Massachusetts, the problem is one of her own creation. Defendant cavalierly made the decision to move to New York without taking into account the rights of the Plaintiff or Child in having a relationship with one another. . . ."

[3]The judge found that the mother's "move to New York was clearly to deprive the [father] of developing a relationship with Child. . . ." She further found that the mother "has produced no evidence which would show that the move to New York would be advantageous to Child's quality of life. . . ."

[4]The judge credited the testimony of the father's expert that "[w]here parents live apart, for proper bonding to occur, it is optimal for the non-custodial parent to have frequent and regular contact with the child. . . . that there has been insufficient frequency and duration of contact between [the father] and Child for bonding to have occurred since the time of birth . . . [and that] the frequency and duration of [the father's] contact with Child remains inadequate with Child living approximately 400 miles away." The judge also found that health insurance for the child would be less expensive in Massachusetts than in New York.

out in *Yannas* v. *Frondistou-Yannas*, 395 Mass. 704, 711-712 (1985) (*Yannas*) to conclude that the mother "failed to articulate a sincere, good reason for relocation." *Id.* at 543. The *Yannas* factors apply to prevent one legal parent from unilaterally relocating with a child to another jurisdiction, thereby affecting the parental rights of the other legal parent. That analysis is triggered only where the rights of two legal parents have been established prior to removal or attempted removal of the child from Massachusetts. See, e.g., *Wakefield* v. *Hegarty*, 67 Mass. App. Ct. 772, 775-776 (2006) (applying *Yannas* test where paternity of unmarried father had previously been established and mother had not yet relocated). In such circumstances, not present in this case, maintaining the status quo strikes an appropriate balance among the interests of all family members involved. See *Yannas, supra* at 712 (in considering request under G. L. c. 208, § 30, to move child to another jurisdiction, "[e]very person, parent and child, has an interest to be considered"). This is not a removal case, and *Yannas* is inapposite. Neither the judge nor the parties has cited to a single case, from any jurisdiction (and I am not aware of any from my own investigation), that gives a judge authority to pull a parent and child unwillingly back to a State where the parent had a prior and unilateral right to leave.

The court concludes, and I concur, that the judge had no authority to issue an order during the pendency of litigation for the child (and hence the mother) to move back to Massachusetts. See *ante* at 550. As the court acknowledges, a person having sole parental rights is "free to move with the child wherever she wishe[s]." *Id.* at 549-550. As a matter of law, it should make no difference to a parent's freedom to relocate that another party subsequently files to establish parental rights. See G. L. c. 209C, § 10 (*a*), (*b*). There is no statutory basis or reason in fairness for the mother to remain in Massachusetts on the filing of a complaint for paternity, which may be filed for any number of extraneous reasons and may be denied. See *Paternity of Cheryl*, 434 Mass. 23, 32 (2001) ("A man may acknowledge paternity for a variety of reasons, and we cannot assume that biology is the sole impetus in every case"). The paternity of a nonmarital child is not certain and is not infrequently in dispute.

In contrast, the motherhood of a nonmarital child is established at birth. We may presume that the Legislature took these elementary facts into account in crafting a statutory scheme that gives primacy to the stability of a nonmarital child by vesting sole legal parentage in the mother unless and until there has issued a legal determination of paternity or a voluntary acknowledgment of paternity. The Legislature's policy choices may mean that a responsible and well-meaning litigant like the plaintiff in this case is disadvantaged where he elects not to establish paternity upon or soon after the birth of the child. Our role, however, is to faithfully construe the statute.

I concur that the judgment must be vacated and the case remanded to the Probate and Family Court for further proceedings as to custody and visitation in light of the "special exception" set out by the court. *Ante* at 555.